IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AMOS KAUFFMAN                    :         CIVIL ACTION
                                 :
        v.                       :
                                 :
THE PENNSYLVANIA SOCIETY FOR     :
THE PREVENTION OF CRUELTY TO     :
ANIMALS, et al.                  :         NO. 10-2504

MEMORANDUM

Dalzell, J.                                February 16, 2011

Plaintiff Amos Kauffman ("Kauffman") sues The

Pennsylvania Society for the Prevention of Cruelty to Animals

("PSPCA") and two of its employees, Ashley Mutch ("Mutch") and

Kristen Sullivan ("Sullivan"), alleging civil rights violations

under 42 U.S.C. § 1983 and a common law claim for conversion.

This suit arises out of Mutch's investigation of Kauffman's farm

on November 23, 2009, Mutch and Sullivan's seizure a day later of

animals from the farm pursuant to a search warrant, and

defendants' refusal to return these animals to Kauffman after the

dismissal of state animal cruelty charges against him.

Kauffman contends that all three defendants violated §

1983 by unconstitutionally seizing his property, searching his

farm, and failing properly to train Mutch and Sullivan. Kauffman

also asserts that all three defendants committed the tort of

conversion by depriving him of his property, and that he is

entitled to a declaratory judgment that defendants unconstitutionally searched and seized his property.

The defendants urge us to dismiss Kauffman's § 1983 claims pursuant to Rule 12(b)(6) because (1) when Mutch and Sullivan seized Kauffman's property, they acted pursuant to a valid search warrant; (2) Mutch and Sullivan are entitled to qualified immunity; and (3) Kauffman has not successfully asserted a <u>Monell</u> claim against the PSPCA for failure to train or supervise. As will be seen, defendants' second contention takes us into largely uncharted waters. In the end we grant defendants' motion to dismiss in part and deny it in part. We also will order Kauffman to explain how the investigation of his farm violated the Fourth Amendment and how he has availed himself of the processes Pennsylvania affords him to retrieve his property.

## I.   <u>Factual Background</u>

In evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), we must "accept all factual allegations in the complaint as true and give the pleader the benefit of all reasonable inferences that can be fairly drawn therefrom." <u>Ordonez v. Yost</u>, 289 Fed. Appx. 553, 554 (3d Cir. 2008) (quoting

<u>Kost v. Kozakiewicz</u>, 1 F. 3d 176, 183 (3d Cir. 1993)).  In

deciding such motions, courts may "consider only the allegations

in the complaint, exhibits attached to the complaint, matters of

public record, and documents that form the basis of a claim,"

<u>Brown v. Daniels</u>, 128 Fed. Appx. 910, 913 (3d Cir. 2005) (quoting

<u>Lum v. Bank of America</u>, 361 F.3d 217, 222 n.3 (3d Cir. 2004))

(internal quotation marks omitted), where a document forms the

basis of a claim if it is "integral to or explicitly relied upon

in the complaint."  <u>Id.</u> (quoting <u>In re Burlington Coat Factory</u>

<u>Sec. Litig.</u>, 114 F.3d 1410, 1426 (3d Cir. 1997)) (emphasis

omitted).  We will thus rehearse the facts Kauffman alleges in

his complaint as well as other relevant facts drawn from exhibits

attached to that complaint and found in the public record.

Kauffman is a farmer in Chester County, Pennsylvania,

Pl.'s Compl. ¶ 8.  Kauffman and his family have long operated a

dairy farm and greenhouse there.  <u>Id.</u> ¶ 15.  Throughout

Kauffman's lifetime as a farmer, he and his family have kept pet

dogs and cats on their property.  <u>Id.</u> ¶ 16.  While Kauffman has

occasionally sold puppies to members of his community, he has

never operated a kennel or applied for a kennel license because

the number of dogs on his property has never exceeded twenty-

five.  <u>Id.</u> ¶ 17.

The PSPCA is a non-profit corporation organized under the laws of the Commonwealth of Pennsylvania. Id. ¶ 9. It enforces Pennsylvania's laws dealing with criminal cruelty to animals through its humane society police officers.[1] Id. At all times relevant to this action, the PSPCA employed Mutch and Sullivan as humane society police officers, with Sullivan in a supervisory capacity. Id. ¶¶ 11-12.

In November of 2009, the Kauffman family had several dogs and one cat on their farm, including an adult male and adult female Chihuahua and a female German shepherd. "[T]wo of the Kauffman family dogs, the Chihuahua and Shepherd had a litter of puppies," and the Kauffmans sold "a couple puppies" to others in their community. Id. ¶ 19.

According to Kauffman, on November 11, 2009, Mutch "purportedly received a complaint about 'sick puppies' being sold by Amos Kauffman," and on November 23, 2009 Mutch "purportedly went 'undercover' to the Kauffman farm and observed five puppies

_____

[1] Specifically, under 18 Pa. Cons. Stat. § 5511(i), "[a]n agent of any society or association for the prevention of cruelty to animals, incorporated under the laws of the Commonwealth, shall have the same powers to initiate criminal proceedings provided for police officers by the Pennsylvania Rules of Criminal Procedure," where § 5511 generally deals with "[c]ruelty to animals."

4

living in a pen that, incredibly, smelled of urine and feces."[2]

Id. ¶¶ 20-21.  Another individual, whom Kauffman identifies only

as Mutch's "sidekick," accompanied Mutch to Kauffman's farm.  Id.

¶ 22.  Both Mutch and this "sidekick" "lied to Mr. Kauffman about

the true intent of their visit," and during the twenty minutes

they spent at the farm neither voiced any complaints about the

conditions of the animals they observed.  Id. ¶¶ 22-23.

Mutch bought four puppies from Kauffman on November 23,

2009 and took them to the PSPCA headquarters, and later that same

day veterinarian Kim Russell of the PSPCA examined the puppies --

again, "purportedly" -- and found them to be anemic and to have

parasites, with one puppy suffering from ringworm.  Id. ¶¶ 21,

---

[2] Kauffman does not make clear what he means here by
"purportedly" and "incredibly."  Kauffman does not deny that
Mutch received a complaint, went to the Kauffman farm, or that
she observed puppies living in a pen that smelled of urine and
feces, but he does use one word, "purportedly," that suggests
skepticism, and another, "incredibly", that may suggest either
skepticism or amazement.  VII Oxford English Dictionary 829 (2d
ed. 1989) (defining incredibly as "in a way or to an extent that
is impossible or very difficult to believe; to an extent that one
would not have believed possible").  We are unsure what legal
import Kauffman means the tone of these expressions to have.  In
any event, given that one of the counts asserted in Kauffman's
complaint is predicated upon an event -- Mutch's undercover
search -- that Kauffman suggests only "purportedly" took place,
we will ignore Kauffman's attitudinal adverbs here, and take
Kauffman's complaint to mean he does not deny that these events
happened.

24.  On November 24, 2009, after securing the approval of
Assistant District Attorney Lauren Dentone, Mutch obtained a
warrant from a magistrate judge to search the Kauffman property
and seize "all animals . . . and any/all proof of ownership of
animals and/or medical records/supplies for animals and/or
residence."  Ex. 3 to Pl.'s Compl at 1.  The magistrate judge
issued the warrant based on Mutch's affidavit of probable cause,
which reviewed Mutch's training, qualifications, and employment
with the PSPCA, described the phone call Mutch had received
reporting "sick puppies" at the Kauffman property, recounted
Mutch's visit to Kauffman's farm and her observation of "puppies
living in a pen that had fecal matter and smelled of feces and
urine," and explained the results of Russell's veterinary
examination of the purchased puppies.  Id. at 2.  On November 24,
2009, Mutch and Sullivan arrived at Kauffman's farm armed with
weapons and dressed in uniform.  They identified themselves as
humane society police officers.  Pl.'s Compl. ¶ 26.  They then
seized "all the family pets along with the file folders for the
dogs, rabies records, dog food receipts, and a notebook."  Id. ¶
27.

     Mutch charged Kauffman with ten counts of animal
cruelty, alleging that Kauffman's animals had overgrown nails and

6

fleas and that Kauffman kept unclean pens.  Id. ¶ 28.  On March

25, 2010, "[a]ll of the charges brought by Mutch were dismissed

at the district justice level."  Id. ¶ 34.  Though the charges

have been dismissed, the defendants have refused to return the

seized animals to the Kauffmans, instead threatening them with

fines unless they leave the animals with the PSPCA.  Id. ¶ 35.

## II.  **Analysis**

As already noted, Kauffman asserts five counts, with

each count directed at all three defendants: (1) a declaratory

judgment that defendants unconstitutionally searched and seized

Kauffman's property; (2) unconstitutional seizure in violation of

the Fourth Amendment and § 1983; (3) unconstitutional search in

violation of the Fourth Amendment and § 1983; (4) inadequate

training and supervision in violation of § 1983; and (5) state

common law conversion.  Defendants move under Fed. R. Civ. P.

12(b)(6) to dismiss Counts II, III, and IV of Kauffman's

complaint.

As a prefatory matter, we note that while Fed. R. Civ.

P. 8(a)(3) provides that "[a] pleading that states a claim for

relief must contain . . . a demand for the relief sought, which

may include relief in the alternative or different types of

relief," "the pleader need only make one demand for relief regardless of the number of claims that are asserted." 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1255 (3d ed. 2008). The relief a plaintiff seeks, and the claims he asserts, are thus conceptually distinct components of a complaint, and there is no need for a plaintiff to devote a separate count of a complaint to a request for a certain type of relief, as Kauffman does in seeking a declaratory judgment under Count I. Such belt-and-suspenders pleading is particularly inapt when the plaintiff includes an application for the claimed relief in his concluding prayer for relief, as Kauffman does here. Pl.'s Compl. at 13 ("[P]laintiff prays that [t]his honorable court declare that the actions of defendants to be [sic] in violation of the Fourth Amendment to the United States Constitution.") We will thus dismiss Count I of the complaint as redundant and not in conformity with Rule 8(a)(3).

As to Rule 12(b)(6), "[t]he test in reviewing a motion to dismiss for failure to state a claim is whether, under any reasonable reading of the pleadings, [the] plaintiff may be entitled to relief." Kundratic v. Thomas, 2011 WL 208636, at *1 (3d Cir. 2011) (brackets in original) (quoting Holder v. City of Allentown, 987 F.2d 188, 194 (3d Cir. 1993)), and "the defendant

bears the burden of showing that no claim has been presented."

Hedges v. U.S., 404 F.3d 744, 750 (3d Cir. 2005) (citing Kehr

Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir.

1991)).

"[A] complaint's 'factual allegations must be enough to

raise a right to relief above the speculative level,'" Ideen v.

Straub, 385 Fed. Appx. 123, 124 (3d Cir. 2010) (quoting Bell

Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)), and "must

not be 'so undeveloped that [the complaint] does not provide a

defendant the type of notice of claim which is contemplated by

[Fed. R. Civ. P. 8]." Umland v. PLANCO Fin. Servs., Inc., 542

F.3d 59, 64 (3d Cir. 2008) (quoting Phillips v. Cty. of

Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)). Thus, a pleading

may not simply offer "labels and conclusions," Twombly, 550 U.S.

at 555, and "[t]hreadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice."

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). Moreover, "only

a complaint that states a plausible claim for relief survives a

motion to dismiss." Id. at 1950. This standard is not as

demanding as a "probability requirement," but a plaintiff must

allege facts sufficient to show that there is "more than a sheer

possibility that a defendant has acted unlawfully." Id. at 1949
(internal quotation marks omitted).

A defendant may therefore succeed on a Rule 12(b)(6)
motion by showing that the factual allegations in a plaintiff's
complaint do not state a plausible claim for relief. Pertinent
to qualified immunity, a defendant may raise an affirmative
defense "on a Rule 12(b)(6) motion if the predicate establishing
the defense is apparent from the face of the complaint." Bethel
v. Jendoco Constr'n Corp., 570 F.2d 1168, 1174 n.10 (3d Cir.
1978).

### A. Counts II, III, & IV: PSPCA's Organizational Liability

For convenience, we will address the counts of
Kauffman's complaint in reverse order, beginning with Count IV.
Under this count, Kauffman advances a claim for "inadequate
training and supervision" under § 1983 against the PSPCA, Mutch,
and Sullivan, arguing that (1) "[d]efendant PSPCA despite its
duty to do so, failed to provide sufficient or adequate training
and education," Pl.'s Compl. ¶ 53; (2) "[t]he actions of
Defendant PSPCA constituted part of a pattern and practice of
unlawful and improper behavior," id. ¶ 55; and (3) "[a]s a result
of defendants' malicious conduct, Plaintiff has been injured and

10

deprived of due process of law, his right to be free from unconstitutional search and seizure and his property." Id. ¶ 56.

Defendants respond that "[p]laintiff has identified no such custom, practice or policy" justifying Monell liability, Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' MTD Memo") at 10, and that since Kauffman "ha[s] not alleged that individual Defendants Sullivan and Mutch had any policymaking authority, the Monell claims against these individual Defendants, should be dismissed." Id. at 12. Kauffman replies that "the PSPCA is not a government agency, entity or a municipal unit. Therefore, Monell is inapplicable, and the PSPCA can be held vicariously liable for the actions of its agents and employees." Pl.'s Resp. to Defs.' Mot. to Dismiss ("Pl.'s Resp.") at 15.

We must grant defendants' request that we dismiss Count IV with respect to Sullivan and Mutch as Kauffman fails to mention either Sullivan or Mutch in Count IV, much less allege that either was responsible for a failure to train or supervise (presumably, themselves). We therefore turn to the PSPCA's liability under Count IV.

Under Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978), "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it

is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Kauffman rejects the proposition that <u>Monell</u> applies to other private organizations faced with liability under § 1983. In support of this position, Kauffman cites two opinions in which our Court of Appeals "appl[ied] <u>Monell</u> to private entities acting under the color of state law" while also taking that Court to task because it "failed to provide detailed analysis of its extension of vicarious liability protection to private entities, and the cases it cites do not support the proposition." Pl.'s Resp. at 16.

Kauffman first quotes <u>Regan v. Upper Darby Twp.</u>, 363 Fed. Appx. 917, 922 (3d Cir. 2010) (internal quotation marks and brackets omitted), where our Court of Appeals concluded that a "private entity that is a state actor may not be held vicariously liable under § 1983 for the actions of its agents because there is no <u>respondeat</u> <u>superior</u> theory of municipal liability." He next cites <u>Natale v. Camden County Correctional Facility</u>, 318 F.3d 575, 583-84 (3d Cir. 2003), where the Court found that "[i]n order for PHS [a private healthcare provider] to be liable, the

Natales must provide evidence that there was a relevant PHS policy or custom, and that the policy caused the constitutional violation they allege." Despite Kauffman's disagreement with our Court of Appeals, we will follow the Court's guidance as we are obliged to do.

In the first place, the opinions Kauffman cites are <u>not</u> anomalous. Our Court of Appeals has consistently rejected <u>respondeat superior</u> liability and established <u>Monell</u> as the only basis for organizational liability under § 1983. Thus, in <u>Dubois v. Vargas</u>, 148 Fed. Appx. 111, 113-14 (3d Cir. 2005) (citation omitted), our Court of Appeals explained that "liability under 42 U.S.C. § 1983 cannot be based solely upon the doctrine of respondeat superior. In order to establish liability [against an organization], Dubois would have to present evidence that Vargas's actions were the result of some relevant organizational policy or custom, the implementation of which resulted in a violation of Dubois's constitutional rights." And in <u>Mark v. Borough of Hatboro</u>, 51 F.3d 1137, 1155 (3d Cir. 1995), our Court of Appeals applied <u>Monell</u> to a § 1983 action against a volunteer fire company, refusing to impose liability because the defendant "did not enact a policy evincing willful disregard or deliberate indifference to plaintiff's rights." We therefore reject

13

Kauffman's assertion of a <u>respondeat superior</u> theory of liability against the PSPCA under § 1983.[3]

To judge whether Kauffman has stated a claim against the PSPCA under Count IV, then, we must first consider whether he has alleged a policy or custom. Kauffman baldly asserts that "[t]he actions of Defendant PSPCA constituted part of a pattern and practice of unlawful and improper behavior," Pl.'s Compl. ¶ 55, but provides <u>no</u> factual averments supporting his assertion. Ignoring, as we must, "mere conclusory statements," <u>Iqbal</u>, 129 S. Ct. at 1949, we cannot conclude that Kauffman has stated a claim for organizational liability under § 1983 against the PSPCA. We therefore will dismiss Count IV in its entirety.

_____

[3] It appears that Kauffman drafted his complaint believing that <u>Monell</u> applied to his § 1983 claim against the PSPCA, and only later concluded that a vicarious liability theory was also available. As the Supreme Court explained in <u>Monell</u>, 436 U.S. at 692, vicarious liability permits a plaintiff "to impose liability vicariously . . . solely on the basis of the existence of an employer-employee relationship with a tortfeasor." If Kauffman believed from the start that he could succeed on a vicarious liability theory under § 1983, it seems odd that he would plead the PSPCA's failure to train and supervise in his complaint, and then further allege a "pattern and practice of unlawful and improper behavior" by the PSPCA, Pl.'s Compl. ¶ 55, when it would have been far easier merely to allege an employer-employee relationship between the PSPCA and Mutch and Sullivan.

In Counts II and III, Kauffman alleges unconstitutional seizures and searches in violation of the Fourth Amendment and § 1983. Confusingly, Kauffman asserts Counts II and III not only against Mutch and Sullivan, but also against the PSPCA. As we have explained, Kauffman may not state a § 1983 claim against the PSPCA based on vicarious liability, and he alleges no custom or policy on the part of the PSPCA leading to the violations asserted in Counts II and III. We will therefore dismiss the claims against the PSPCA under Counts II and III, and consider these counts only as they relate to Sullivan and Mutch.

## B.  Count III: Defendants' Claim of Qualified Immunity

In Count III, Kauffman alleges that "[d]efendants operated on November 23, 2009, when they 'went undercover' without the knowledge or supervision of any law enforcement officer in Chester County or any other part of the Commonwealth," and that "[d]efendants' ruse and failure to advise plaintiffs of the invasion of the government into their home is a violation of the [sic] Mr. Kauffman's rights to be free from unconstitutional searches." Pl.'s Compl. ¶¶ 50-51. Defendants respond that "Sullivan and Mutch are entitled to qualified immunity, for their investigation of suspected animal cruelty pursuant to 18 Pa. C.S.

15

§ 5511. Should it be determined that Plaintiff's Exhibit 3 is somehow defective, the officers are nonetheless entitled to qualified immunity, as Plaintiff's exhibit, is a facially valid warrant, pursuant to which the Officers were acting." Defs.' MTD Memo at 6. Kauffman responds that the defendants "are not entitled to qualified immunity." Pl.'s Resp. at 10.

The defendants seem to misapprehend Kauffman's argument under Count III. That Count alleges not that the defendants performed an unconstitutional search on November 24, 2009 -- when Mutch and Sullivan searched Kauffman's property pursuant to a search warrant -- but that such a violation occurred on November 23, 2009, when Mutch visited Kauffman's farm "undercover." Despite defendants' misreading of Count III, we may nevertheless consider whether the defendants are entitled to a defense of qualified immunity for the November 23, 2009 "search."

Our Court of Appeals has not yet determined whether officers of humane societies may claim qualified immunity when they carry out law enforcement functions. Those district courts within our Circuit that have considered the question have ultimately declined to rule on it. See Allen v. Pa. Soc'y for Prevention of Cruelty to Animals, 488 F. Supp. 2d 450, 468 n.17 (M.D.Pa. 2007) (deciding that "absent more compelling record

16

evidence, the court is unable to conclude that [a PSPCA officer] is entitled to either absolute or qualified immunity"); <u>Taylor v. North</u>, 1996 WL 482985, at *3 (E.D. Pa. 1996) (finding that the Montgomery County SPCA and one of its officers' "conduct is clearly not protected by qualified immunity" without considering whether the defendants could be entitled to the defense).  This is therefore a matter of first impression in our Circuit, and thus we must return to first principles to resolve it.

The Supreme Court in recent times has decided two cases involving the assertion of the qualified immunity defense by private defendants, <u>Wyatt v. Cole</u>, 504 U.S. 158 (1992), and <u>Richardson v. McKnight</u>, 521 U.S. 399 (1997).  In <u>Wyatt</u>, the Court examined "whether qualified immunity, as enunciated in <u>Harlow</u>, is available for private defendants faced with § 1983 liability for invoking a state replevin, garnishment, or attachment statute," and found "[t]hat answer is no."  504 U.S. at 168-69.  In <u>Richardson</u>, it concluded that "private prison guards, unlike those who work directly for the government, do not enjoy immunity from suit in a § 1983 case."  521 U.S. at 412.  While <u>Wyatt</u> bluntly stated that the rationales supporting qualified immunity "are not transferable to private parties," 504 U.S. at 168, <u>Richardson</u> explained that "<u>Wyatt</u> did not consider its answer to

the question before it as one applicable to <u>all</u> private

individuals." 521 U.S. at 404 (emphasis in original). To

determine whether PSPCA officers may be entitled to qualified

immunity from suit under § 1983 when they assist in law

enforcement, we must follow <u>Wyatt</u>'s teaching that:

> [W]e have accorded certain government
> officials either absolute or qualified
> immunity from suit if the tradition of
> immunity was so firmly rooted in the common
> law and was supported by such strong policy
> reasons that Congress would have specifically
> so provided had it wished to abolish the
> doctrine. If parties seeking immunity were
> shielded from tort liability when Congress
> enacted the Civil Rights Act of 1871 -- § 1
> of which is codified at 42 U.S.C. § 1983 --
> we infer from legislative silence that
> Congress did not intend to abrogate such
> immunities when it imposed liability for
> actions taken under color of state law.
> Additionally, irrespective of the common law
> support, we will not recognize an immunity
> available at common law if § 1983's history
> or purpose counsel against applying it in §
> 1983 actions.

504 U.S. at 164 (internal quotation marks and citations omitted).

It seems clear under <u>Wyatt</u> that whether qualified

immunity for particular defendants existed at common law in 1871

is the threshold inquiry that must take place before any

investigation of whether such immunity would comport with §

1983's history or purpose. The statement in <u>Richardson</u> that we

18

must "look both to history and to the purposes that underlie government employee immunity in order to find the answer," 521 U.S. at 404 (emphasis added), and Richardson's exploration of the immunity doctrine's purposes after finding "no conclusive evidence of a historical tradition of immunity," id. at 407, are not to the contrary. Richardson quoted language from Wyatt suggesting that both common law support and consonance with § 1983's purposes are prerequisites for qualified immunity: "[T]his Court has nonetheless accorded immunity where a '"tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that 'Congress would have specifically so provided had it wished to abolish the doctrine.'"'" Id. at 403 (emphasis added) (quoting Wyatt, 504 U.S. at 164 (quoting Owen v. City of Independence, 445 U.S. 622, 627 (1980) (quoting Pierson v. Ray, 386 U.S. 547, 555 (1967))))). And Richardson's examination of both the common law and the immunity's purposes may be ascribed to the Court's thoroughness and not to any intent to revise Wyatt's test.

We have found no support in the common law for a qualified immunity defense to humane society officers applicable in 1871. Indeed, our research reveals not one case concerning a humane society or a society for the prevention of cruelty to

19

animals that predates 1871.  This is not surprising in view of

the reality that the PSPCA only came into being in 1868[4] and that

it is not unlikely that other such societies were not established

until after 1871.  We therefore conclude that qualified immunity

is not generally available to officers of humane societies when

they enforce animal cruelty laws.[5]

_____

[4] As the Supreme Court of Pennsylvania has explained,
quoting the Act of 1868, P.L. 615, the Pennsylvania General
Assembly created the SPCA "'to provide effective means for the
prevention of cruelty to animals throughout the state of
Pennsylvania, and for the enforcement of all laws heretofore or
hereafter enacted for the protection of dumb animals.'"  Snead v.
SPCA of Pennsylvania, 985 A.2d 909, 912 (Pa. 2009).

[5] While the lack of support in the common law for
qualified immunity for humane society officers demonstrates,
without need for further inquiry, that such officers may not
claim qualified immunity, we note that were our determination to
turn only on the conformity of such a grant with the purposes of
§ 1983, it might necessitate a different result.  The Supreme
Court explained in Wyatt that "we have recognized qualified
immunity for government officials where it was necessary to
preserve their ability to serve the public good or to ensure that
talented candidates were not deterred by the threat of damages
suits from entering public service."  504 U.S. at 167.  Wyatt's
holding was based in part on the contention that "private parties
hold no office requiring them to exercise discretion; nor are
they principally concerned with enhancing the public good."  Id.
at 168.  Richardson took a more nuanced approach to the public
policy inquiry, concluding only that qualified immunity is not
available when "a private firm, systematically organized to
assume a major lengthy administrative task (managing an
institution) with limited direct supervision by the government,
undertakes that task for profit and potentially in competition
with other firms."  521 U.S. at 413.  Richardson grounded this
(continued...)

20

One last argument remains with respect to qualified

immunity.  In Richardson, the Supreme Court cautioned that "we

have answered the immunity question narrowly, in the context in

which it arose. . . . The case does not involve a private

individual briefly associated with a government body, serving as

an adjunct to government in an essential governmental activity,

or acting under close official supervision."  521 U.S. at 413.

In a case where it did, Judge Caputo has concluded that the

private firm Pennsylvania Power & Light Company ("PP & L") was

entitled to qualified immunity from suit under § 1983 when city

_____

[5] (...continued)
holding in its observations that "marketplace pressures provide
the private firm with strong incentives to avoid overly timid,
insufficiently vigorous, unduly fearful, or 'nonarduous' employee
job performance," id. at 410, and that "'privatization' helps to
meet the immunity-related need 'to ensure that talented
candidates' are 'not deterred by the threat of damages suits from
entering public service' . . . . in part because of the
comprehensive insurance-coverage requirements just mentioned."
Id. at 411 (quoting Wyatt, 504 U.S. at 167).
         To be sure, (1) the PSPCA does not appear to be a
private firm participating in a competitive market; (2) we have
not been apprised of any insurance-coverage requirement applying
to humane societies; (3) PSPCA officers clearly exercise some
discretion in enforcing the law; and (4) judging from the
Pennsylvania law establishing the PSPCA, it is indeed an
organization "principally concerned with enhancing the public
good," 504 U.S. at 168.  Thus, the rationales advanced in Wyatt
and Richardson for qualified immunity might well apply to the
PSPCA and its officers.  Nonetheless, the dearth of support in
the common law for qualified immunity on the part of humane
society officers leads us to withhold its grace under § 1983.

21

officials "contacted PP & L . . . and requested that power to Plaintiff's building be suspended," since PP & L was "a private business serving as an adjunct to the local government in an essential government activity, and acting under close governmental supervision." Gardner v. McGroarty, 2002 WL 32107213, at *3, *8 (M.D. Pa. 2002). Under 22 Pa. Cons. Stat. § 3710, "all search warrant applications filed in connection with alleged violations of cruelty to animals laws must have the approval of the district attorney in the county of the alleged offense prior to filing," and Mutch in fact got the approval of an assistant district attorney before submitting her search warrant application to a magistrate judge. Ex. 3 to Pl.'s Compl. at 2. Mutch and Sullivan, therefore, may well be entitled to qualified immunity with respect to their execution of the search warrant on November 24, 2009 -- a point we will revisit in the next section when we deal with Count II.

Kauffman alleges, however, that "[d]efendants operated on November 23, 2009, when they 'went undercover' without the knowledge or supervision of any law enforcement officer in Chester County or any other part of the Commonwealth." Pl. Compl. ¶ 50. Taking Kauffman's allegations as true in ruling on defendants' motion to dismiss, we cannot conclude that Mutch on

22

November 23, 2009 "act[ed] under close official supervision,"

Richardson, 521 U.S. at 413, when she visited Kauffman's

property.  And while the investigation of animal cruelty crimes

certainly furthers an important governmental purpose, we cannot

determine that Mutch "serv[ed] as an adjunct to government in an

essential governmental activity," id., in investigating alleged

crimes at the Kauffman farm.  The mere investigation of crimes by

a private citizen, without the request or supervision of a

government official, does not by itself make that person an

adjunct of the government.  The defense of qualified immunity,

then, does not extend to Mutch's "undercover" visit to Kauffman's

farm on November 23, 2009.

### C. __Count III: Plaintiff's Failure to State a Claim__

Though no qualified immunity is available to the

defendants with respect to Count III of Kauffman's complaint, we

remain unconvinced that Kauffman has stated a claim under § 1983.

To state a claim under § 1983, "a plaintiff must allege the

violation of a right secured by the Constitution and laws of the

United States, and must show that the alleged deprivation was

committed by a person acting under color of state law."  West v.

Atkins, 487 U.S. 42, 48 (1988).  The Supreme Court has observed

23

that "[i]n cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment," <u>United States v. Price</u>, 383 U.S. 787, 794 n.7 (1966), and has "found state action present in the exercise by a private entity of powers traditionally exclusively reserved to the State." <u>Jackson v. Metropolitan Edison Co.</u>, 419 U.S. 345, 352 (1974). Kauffman states that Mutch carried out an undercover search of his property on November 23, 2009 pursuant to 18 Pa. Cons. Stat. § 5511(i); he has thus alleged that Mutch exercised "powers traditionally exclusively reserved to the State." <u>See also Allen</u>, 488 F. Supp. 2d at 462 (finding that the PSPCA and humane society police officers "satisfy the 'acting under color of state law' requirement"). Whether Kauffman has alleged that Mutch "violat[ed] a right secured by the Constitution and laws of the United States," <u>West</u>, 487 U.S. at 48, is far less clear, and Kauffman has alleged <u>no</u> violation of any sort by Sullivan under Count III.

The Supreme Court has explained that "[a] government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant. Of course, this does not mean that, whenever entry is obtained by invitation and the

24

locus is characterized as a place of business, an agent is authorized to conduct a general search for incriminating materials." Lewis v. United States, 385 U.S. 206, 211 (1966). See also United States v. Baldwin, 621 F.2d 251, (6th Cir. 1980), cert. denied, 450 U.S. 1045, 1045 (1981) (rejecting Fourth Amendment challenge where undercover police officer gained defendant's confidence, obtained employment as his chauffeur and general handyman, and took evidence from his home); United States v. Butler, 2010 WL 5416790, at *4 (3d Cir. 2010) ("It is therefore clear that officers may seek citizens' consent in investigating crimes, and that officers need not always announce their true identities when they do so.").

From Kauffman's complaint, we are told that Mutch and "her sidekick" obtained Kauffman's consent to visit his farm, purchased several puppies while on the property, and left after less than twenty minutes. Pl.'s Compl. ¶¶ 21-23. Kauffman does not allege that Mutch took any property from him or conducted any search of the property without his consent. The jurisprudence suggests that Kauffman has not alleged the "violation of a right secured by the Constitution and laws of the United States," West, 487 U.S. at 48, and hence he has failed to state a § 1983 claim for unconstitutional search. We likewise note that Kauffman's

25

complaint fails to allege any involvement by Sullivan in the
November 23, 2009 "search," though Kauffman also asserts his
claims in Count III against Sullivan.

We are mindful that defendants in their motion did not
raise Kauffman's failure to allege the violation of a right under
Count III of his complaint, or his failure to state a claim
against Sullivan under that count. "Sua sponte dismissal of a
claim is disfavored and inappropriate unless the basis for
dismissal is apparent from the face of the complaint," Giles v.
Volvo Trucks N. Am., 551 F. Supp. 2d 359, 369 (M.D. Pa. 2008)
(Kane, C.J.) (citing Ray v. Kertes, 285 F.3d 287, 297 (3d Cir.
2002)), and "[b]efore sua sponte dismissal is appropriate . . . a
Court must give a plaintiff notice and an opportunity to be heard
on the legal viability of his complaint." Id. (citing Dougherty
v. Harper's Magazine Co., 537 F.2d 758, 761 (3d Cir. 1976)). We
will thus afford Kauffman leave to file a brief explaining how
his complaint alleges a Fourth Amendment violation under Count
III in light of the cited jurisprudence.


D.  **Count II: Defendants' Claim of Qualified Immunity**

Kauffman asserts that the defendants unconstitutionally seized his property in violation of the Fourth Amendment and 42 U.S.C. § 1983 because "[d]efendants seized plaintiff's property and continue to refuse to return plaintiff's property without probable case [sic] and brought charges against Amos Kauffman without probable cause." Pl.'s Compl. ¶ 44. In support of this claim, Kauffman first argues that "[p]laintiff had demonstrated an unconditional willingness to cooperate in resolving any potential or perceived problems and had been treating the animals through services of veterinarians," and contends further that "[e]ven assuming that the facts contained in the affidavit of Mutch are true, there is no probable cause to arrest, cite or seize property based on the assertions in the warrant as nothing supports a violation of the animal cruelty laws and any reasonable well-trained officer would have recognized that the search was illegal." Id. ¶¶ 43, 46.

Defendants respond that "Sullivan and Mutch are entitled to qualified immunity, for their investigation of suspected animal cruelty pursuant to 18 Pa. C.S. § 5511." Defs. MTD Memo at 6. They further assert that "[p]laintiff would have the Court hold that the Humane Society Police Officers who were present at his home acted illegally in serving the warrant. To

27

so find, the Court would have to invalidate the warrant itself.
Given the undeniable preference for law enforcement to obtain a
warrant, the individual SPCA Humane Society Officers acted
reasonably, and legally, in doing so, here." Id. at 4.  Kauffman
counters that Sullivan and Mutch "are not entitled to qualified
immunity," Pl.'s Resp. at 10, and that their "argument flies in
the face of Fourth Amendment jurisprudence, which clearly allows
for the challenge of an already-existing warrant."  Id. at 6.

Given that "qualified immunity is in part an
entitlement not to be forced to litigate the consequences of
official conduct," Mitchell v. Forsyth, 472 U.S. 511, 527 (1985),
a court should address the issue "at the earliest possible stage
in litigation."  Hunter v. Bryant, 502 U.S. 224, 227 (1991).  We
will thus first consider whether Sullivan and Mutch may be
entitled to qualified immunity as to Count III.

We have already explained why humane society officers
may not generally claim an entitlement to qualified immunity when
they carry out their law enforcement activities.  As we noted
above, the Supreme Court has declined to decide whether qualified
immunity might be available to "a private individual briefly
associated with a government body, serving as an adjunct to
government in an essential governmental activity, or acting under

close official supervision." <u>Richardson</u>, 521 U.S. at 413. Our Court of Appeals has not ruled on this question, but the holdings of other Courts of Appeals suggest that "defendants acting under close official supervision [are permitted] to assert qualified immunity in the face of a § 1983 suit." <u>Harrison v. Ash</u>, 539 F.3d 510, 524 n.7 (6th Cir. 2008); <u>see also Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc.</u>, 413 F.3d 1163, 1167 (10th Cir. 2005) (noting that "the courts of appeals have allowed private individuals to assert qualified immunity when the defendants were closely supervised by the government"); <u>but see Toussie v. Powell</u>, 323 F.3d 178, 184 (2d Cir. 2003) ("express[ing] no opinion" on whether "a private individual . . . acting under close official supervision" might enjoy qualified immunity). Following the guidance of these other Courts of Appeal and the clear implication of the Supreme Court's reservation in <u>Richardson</u>, we will extend qualified immunity to Sullivan and Mutch to the extent they "act[ed] under close official supervision."

In <u>Richardson</u>, the Supreme Court denied qualified immunity where a private firm operated "with limited direct supervision by the government," <u>id.</u>, contrasting this firm with publicly operated jails inspected on a monthly or annual basis.

29

Id. at 409 (citing Tenn. Code Ann. §§ 41-4-116, 41-4-140(a)).

See also Ace Beverage Co. v. Lockheed Information Mgmt. Servs.,
144 F.3d 1218, 1219-20 (9th Cir. 1998) ("limited direct
supervision" is present where a private organization "has the
responsibility of general oversight of project activities, while
the City will set policy and monitor [its] performance").
Richardson suggests, therefore, that "close official supervision"
exists when a government actor directly inspects or directs a
private individual's behavior.  Applying this suggestion, it is
evident that Mutch and Sullivan acted subject to precisely such
supervision when they executed the search warrant on November 24,
2009 and seized property from Kauffman's farm.  Before executing
that warrant, Mutch obtained the approval not only of a
magistrate judge but also of an assistant district attorney.
These dual layers of oversight by any fair reading constituted
close official supervision.

        Having concluded that Mutch and Sullivan may assert a
qualified immunity defense with respect to Count II of Kauffman's
complaint, we now must consider whether they are entitled to that
immunity.  As the Supreme Court noted in Saucier v. Katz, 533
U.S. 194, 200-01 (2001), this inquiry proceeds in two steps.
First, "[t]aken in the light most favorable to the party

asserting the injury, do the facts alleged show the officer's
conduct violated a constitutional right?" <u>Id.</u> 533 U.S. at 201.
Second, "if a violation could be made out on a favorable view of
the parties' submissions, the next, sequential step is to ask
whether the right was clearly established." <u>Id.</u> But <u>Saucier</u>'s
two-step sequence is not obligatory: "The judges of the district
courts and the courts of appeals should be permitted to exercise
their sound discretion in deciding which of the two prongs of the
qualified immunity analysis should be addressed first in light of
the circumstances in the particular case at hand." <u>Pearson v.
Callahan</u>, 129 S. Ct. 808, 818 (2009).

We will only consider the first prong of <u>Saucier</u> today.
While Kauffman's allegations suggest that neither Mutch nor
Sullivan violated his constitutional rights in executing the
search warrant of his property on November 24, 2009, we cannot
conclusively resolve this question until Kauffman has responded
to the concerns we raised as to Count III.  Kauffman argues that
"there is no probable cause to arrest, cite or seize property
based on the assertions in the warrant as nothing supports a
violation of the animal cruelty laws and any reasonable well-
trained officer would have recognized that the search was
illegal."  Pl.'s Compl. ¶¶ 43, 46.  As we will explain, this

attack on the facial validity of Mutch's warrant must fail under
the first prong of <u>Saucier</u>, but Kauffman may nevertheless attack
Mutch's search warrant in another manner.

As the Supreme Court explained in <u>Illinois v. Gates</u>,
462 U.S. 213, 236 (1983), "[a] magistrate's 'determination of
probable cause should be paid great deference by reviewing
courts.'" <u>Id.</u> (quoting <u>Spinelli v. United States</u>, 393 U.S. 410,
419 (1969)).  Consequently, the standard for issuing search
warrants is:

> The task of the issuing magistrate is simply
> to make a practical, commonsense decision
> whether, given all the circumstances set
> forth in the affidavit before him, including
> the 'veracity' and 'basis of knowledge' of
> persons supplying hearsay information, there
> is a fair probability that contraband or
> evidence of a crime will be found in a
> particular place.  And the duty of a
> reviewing court is simply to ensure that the
> magistrate had a 'substantial basis for . . .
> conclud[ing]' that probable cause existed.

<u>Id.</u> at 238-39 (ellipsis, brackets in original) (quoting <u>Jones v.</u>
<u>United States</u>, 362 U.S. 257, 271 (1960)).

Notwithstanding Kauffman's penchant for "purportedly"
and "incredibly," he notably does not allege that Mutch's
affidavit in support of her application for a search warrant
contains false statements or omissions.  As a result, we need

only investigate whether the affidavit provided the issuing

magistrate judge with a "substantial basis" for concluding that

there was "a fair probability that contraband or evidence of a

crime will be found in a particular place."[6] Id. We need not

consider the veracity or basis of knowledge of the person who

supplied Mutch with the tip concerning "sick puppies," since

Mutch independently corroborated the tip's details.

Under these circumstances, we have no difficulty

finding that the search warrant issued to Mutch was facially

valid. Under 18 Pa. Const. Ann. § 5511(c)(1),

> A person commits an offense if he wantonly or
> cruelly illtreats, overloads, beats,
> otherwise abuses any animal, or neglects any
> animal as to which he has a duty of care,
> whether belonging to himself or otherwise, or
> abandons any animal, or deprives any animal
> of necessary sustenance, drink, shelter or
> veterinary care, or access to clean and
> sanitary shelter which will protect the
> animal against inclement weather and preserve
> the animal's body heat and keep it dry.

---

[6] Had Kauffman challenged the warrant by asserting that
the predicate affidavit was false, we would instead have embarked
on a different inquiry under which "the plaintiff must prove, by
a preponderance of the evidence, (1) that the affiant knowingly
and deliberately, or with a reckless disregard for the truth,
made false statements or omissions that create a falsehood in
applying for a warrant; and (2) that such statements or omissions
are material, or necessary, to the finding of probable cause."
Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997) (citing
Franks v. Delaware, 438 U.S. 154, 171-72 (1978)).

The description in Mutch's affidavit of "puppies living in a pen that had fecal matter and smelled of feces and urine" at Kauffman's farm, Ex. 3 to Pl.'s Compl. at 2, provided a substantial basis for a magistrate to conclude that a search of Kauffman's property would reveal evidence that Kauffman had deprived animals of "access to clean and sanitary shelter." Mutch's report that puppies purchased from Kauffman "were found to be anemic [and] have an infestation of several parasites," id., provided a substantial basis to believe that a search of the Kauffman farm would uncover evidence of neglect.

Kauffman's assertion that he "had demonstrated an unconditional willingness to cooperate in resolving any potential or perceived problems and had been treating the animals through services of veterinarians," Pl.'s Compl. ¶ 43, is beside the point of the probable cause inquiry. As our Court of Appeals has explained, "the fact that there exists a less intrusive method of achieving the government's goal is not relevant to the Court's reasonableness analysis under the Fourth Amendment." Wilcher v. City of Wilmington, 139 F.3d 366, 377 (3d Cir. 1998). And Kauffman does not suggest -- and we have not found -- any case law suggesting that providing animals with veterinary care constitutes a defense to charges of animal cruelty under

Pennsylvania law. <u>Cf.</u> 18 Pa. Cons. Stat. § 5511(c)(3) (stating that the provision cited above defining cruelty to animals "shall not apply to activity undertaken in normal agricultural operation").

If Kauffman's attack on the facial validity of Mutch's search warrant fails, he still may argue that, since Mutch's "undercover search" of his property on November 23, 2009 violated the Fourth Amendment, any information resulting from that search must not be considered in examining her application for a search warrant. <u>See</u>, <u>e.g.</u>, <u>United States v. Davis</u>, 383 Fed. Appx. 172, 176 (3d Cir. 2010) ("The independent source doctrine next requires us to determine whether there was probable cause for the warrant to issue. The first step of this evaluation requires us to 'purge' the second warrant affidavit of any 'tainted facts and conclusions.'").

As we have already explained, while the allegations in Kauffman's complaint do not appear to state a claim that Mutch violated the Fourth Amendment by visiting Kauffman's farm on November 23, 2009, we will permit Kauffman to brief this point. We will accordingly decline to rule on whether, after purging any "tainted" material from Mutch's affidavit, her application for a search warrant nonetheless demonstrated probable cause.

**E.   Count II: Plaintiff's Fourteenth Amendment Claim**

Having considered Kauffman's claim that Mutch's search warrant was not based on probable cause and the defendants' response that they are entitled to qualified immunity, we are left under Count II only with Kauffman's contention that the defendants "continue to refuse to return plaintiff's property without probable case [sic]."  Pl.'s Compl. ¶ 44.  When a plaintiff "seek[s] return of property lawfully seized but no longer needed for police investigation or criminal prosecution" from a state or local entity, his claim is properly advanced under the Due Process Clause of the Fourteenth Amendment.  See City of West Covina v. Perkins, 525 U.S. 234, 236 (1999).  We will therefore treat Kauffman's assertions regarding defendants' failure to return his property as a Fourteenth Amendment claim.

"In order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate."  Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000).  Under Pa. R. Crim. P. 588(A), "[a] person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on

36

the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized." Kauffman has not alleged that he has availed himself of Rule 588, much less that the procedure the rule establishes is "unavailable or patently inadequate."[7] His Fourteenth Amendment claim therefore appears defective. Nevertheless, recognizing that the defendants did not raise this issue in their motion to dismiss, we will also give Kauffman an opportunity to explain why we should not dismiss this claim.

BY THE COURT:

__\s\Stewart Dalzell

---

[7] As Judge Ambrose has observed, "[s]everal courts have already determined that Pennsylvania has put into place adequate post-deprivation remedies." <u>Barber v. Pennsylvania Dep't of Agric.</u>, 2010 WL 1816791, at *4 (W.D. Pa. 2010) (summarizing district court jurisprudence respecting Pa. R. Crim. P. 588).